UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| MOTORISTS COMMERCIAL MUTUAL INSURANCE COMPANY, </br></br>Plaintiff, </br></br>v. </br></br>ROGER HARTWELL et al., </br></br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 19-cv-11176-DJC |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                                                                                                    **July 20, 2021**

**I.      Introduction**

Plaintiff Motorists Commercial Mutual Insurance Company ("Motorists") filed this lawsuit against Defendants Roger Hartwell ("Hartwell"), Lynnway Auto Auction Company ("Lynnway"), Safety Insurance Company ("Safety"), and the individual Defendants, including Ruben D. Espaillat as Personal Representative of the Estate of Ruben Dario Espaillat, Tammy L. Berio as Personal Representative of the Estate of Elliott Rowlands, Jr., Giovanni Santiago, Steven Sarkis, Kenneth and Maureen Vincent, Sandra Ortiz as Personal Representative of the Estate of Leezandra Aponte, Flavio Januario, Bresmil Robles and Fanny Ramirez, Mark Lee, Shirley Meza Lopez as Personal Representative of the Estate of Brenda Lopez, and Emelly Colon-Santos and Edris M. Santos as Personal Representatives of the Estate of Pantaleon Santos (the "Victim-Defendants"), seeking declaratory judgment under its Commercial Business Insurance Policy No. 6-2360896 (the

1

"Policy") in connection with all civil suits brought in the Middlesex Superior Court (the "Underlying Suits"). D. 65. Defendants and Victim-Defendants have moved for summary judgment as to Motorists' duty to defend, D. 101; D. 79, 102. Motorists has filed a cross motion for summary judgment as to its duty to defend or indemnify Lynnway or Hartwell, D. 106. For the reasons discussed below, the Court ALLOWS Motorists' motion for summary judgment, D. 106, and DENIES Defendants' motions for summary judgment, D. 101; D. 79, 102.

## II.  Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it carries with it the potential to affect the outcome of the suit under applicable law." Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000). The movant bears the burden of demonstrating the absence of a genuine issue of material fact. Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex v. Catrett, 477 U.S. 317, 323 (1986). If the movant meets its burden, the non-moving party may not rest on the allegations or denials in its pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but must come forward with specific admissible facts showing that there is a genuine issue for trial. Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

## III.  Factual Background

Unless otherwise noted, the following facts are undisputed. The following facts are drawn from Motorists' statement of undisputed material facts, D. 108, Defendants' statement of undisputed material facts, D. 81; D. 101-2, each party's response to the same, D. 116-1; D. 112;

D. 121, the documents attached thereto, and Motorists' Primary and Umbrella Policies, D. 65-1; D. 65-2.

### A. The Policy

Motorists, Nashua Automotive, Inc.'s ("Nashua") insurance company, issued a liability policy ("Motorists' Primary Policy") to AutoFair that included a Garage Coverage Form (the "Garage Form"). D. 108 ¶ 1. Under Motorists' Primary Policy, subject to the Policy's terms, conditions and exclusions, Motorists agreed to pay "all sums an 'insured' must pay as damages because of 'bodily injury' . . . caused by an 'accident' and resulting from 'garage operations' involving the ownership, maintenance or use of covered 'autos.'" D. 101-1 at 26; D. 108 ¶ 6. The Motorists' Primary Policy defines "garage operations" as:

> the ownership, maintenance or use of locations for garage business and that portion of the roads or other accesses that adjoin these locations. 'Garage operations' includes the ownership, maintenance or use of the 'autos' indicated in Section I of this Coverage Form as covered "autos" [i.e., "Any Auto"]. 'Garage operations' also include all operations necessary or incidental to a garage business.

D. 101-1 at 27. The Primary Policy covers, under "Who Is An Insured," "[a]nyone else while using with your permission a covered 'auto' you own, hire or borrow except: (c) [s]omeone using a covered 'auto' while he or she is working in a business of selling, servicing or repairing 'autos' unless that business is your 'garage operations.'" D. 65-1 at 26. An endorsement to the Motorists Primary Policy, entitled the New Hampshire Changes in Policy (the "New Hampshire Endorsement") removes this definition of "Who Is An Insured," <u>see</u> D. 101-1 at 26, and states that "[f]or a covered 'auto' licensed or principally garaged in, or 'garage operations' conducted in, New Hampshire, this endorsement modifies insurance provided under the following: [Garage Coverage Form]." D. 101-1 at 28. The updated definition provides that individuals who use a covered auto that the insured owns, hires or borrows, with the insured's permission, are covered

3

unless the individual is "[s]omeone using a covered 'auto' while he or she is working in a business of selling, servicing or repairing 'autos' unless that business is yours." Id. at 28-29.

The New Hampshire Endorsement also adds a Suspended License Exclusion excluding coverage for:

> [a]ny 'insured' for 'bodily injury' or 'property damage' arising out of the operation of any vehicle by that 'insured' and while that 'insured's' driver's license is under suspension or revocation.

This exclusion applies except for two conditions not relevant here. Id. at 29. Motorists issued a Commercial Liability Umbrella Policy, No. 6-2362491 (the "Umbrella Policy"), to Tewksbury Automotive LLC and included as a named insured Nashua and AutoFair. D. 65 ¶ 53; D. 65-2. The Umbrella Policy provides that Motorists "will pay on behalf of the insured the 'ultimate net loss' in excess of the 'applicable underlying limit' which the insured becomes legally obligated to pay as damages because of 'bodily injury,' 'property damage,' 'personal injury' or 'advertising injury' to which this insurance applies." D. 65-2 at 9. It does not provide coverage for the "the ownership, maintenance, operation, use, loading or unloading of any automobile while away from premises owned by, rented to, or controlled by" the insured, "[e]xcept as coverage is available to [the insured] in the underlying policies as set forth in the Schedule of Underlying Insurance." Id. at 22. The Umbrella Policy additionally provides that an insured does not include:

> (a) Any person employed by or engaged in the duties of an auto sales agency, repair shop, service station, storage garage or public parking place that you do not operate.

Id. at 13.

### B. The Underlying Lawsuits

AutoFair is a conglomerate of auto dealerships that includes Nashua's Volkswagen dealership. D. 108 ¶¶ 23-24; D. 116-1 ¶¶ 23-24. Nashua's Volkswagen dealership is located in

Nashua, New Hampshire and sells autos through multiple auction businesses, including Auto Auction of New England, "Southern" and Lynnway. D. 108 ¶¶ 30, 79; D. 116-1 ¶ 30, 79. Lynnway is an auto auction facility owned by Jim Lamb ("Lamb") and George Russo ("Russo"). D. 108 ¶¶ 33, 47; D. 116-1 ¶¶ 33, 47. Its customers include several auto dealerships, including Nashua. D. 108 ¶ 35; D. 116-1 ¶ 35. When hired, Lynnway subcontracts a transportation company to pick up autos from the AutoFair dealer and transports the autos to Lynnway's auction facility, where Lynnway then hires independent contractors to clean and provide detail servicing for the vehicles. D. 108 ¶¶ 36-37; D. 116-1 ¶¶ 36-37. Lynnway does not own Nashua nor does Nashua's several affiliated companies have an ownership interest in Lynnway. D. 108 ¶¶ 49-52; D. 116-1 ¶¶ 49-52.

In April 2017, Nashua accepted a 2006 Jeep Grand Cherokee (the "auto") in exchange for a new vehicle at Nashua's auto dealership. D. 108 ¶ 79; D. 116-1 ¶ 79. On May 3, 2017, Hartwell, a driver employed by Lynnway, was seated inside the Jeep at the Lynnway auction facility. D. 108 ¶¶ 81-83; D. 116-1 ¶¶ 81-83. Hartwell was a Lynnway employee tasked with driving vehicles on Lynnway's property in an auction lane. D. 108 ¶¶ 38, 81-83; D. 116-1 ¶¶ 38, 81-83. According to Harwell, while he was seated inside the Jeep, the Jeep accelerated uncontrollably into the crowd, striking and injuring several individuals. D. 108 ¶¶ 82-83; D. 116-1 ¶¶ 82-83; D. 65 ¶ 32. On the day of the accident, Hartwell received a letter from the Registry of Motor Vehicles ("RMV") stating that "effective 05/03/17, [his] license / right to operate a motor vehicle is revoked for an indefinite period for immediate threat," due to the accident. D. 109-11 at 13. The letter also listed several prior suspensions, dating March 22, 2012, May 23, 2012, and June 12, 2012, each of which was listed for an "indefinite" period. Id. Victim-Defendants dispute whether any of the prior

suspensions remained in effect prior to the accident on May 3, 2017, as Hartwell's license was reinstated on May 6, 2014. D. 121 ¶ 105; D. 109-11 at 10, 13.

## IV.  Procedural History

Motorists instituted this action, seeking declaratory judgment against Defendants. D. 1. On December 13, 2019, the Court granted a partial stay of discovery as to Defendants Hartwell and Lynnway pending the outcome of related criminal proceedings. D. 54. The Victim-Defendants have moved for summary judgment, D. 79, 102, and Defendants Hartwell and Lynnway have done so as well. D. 101. Motorists subsequently filed a cross-motion for summary judgment. D. 106. The Court heard the parties on the pending motions and took these matters under advisement. D. 134.

## V.  Discussion

### A.  Choice of Law

Here, neither Motorists' Primary Policy nor Motorists' Umbrella Policy includes a choice-of-law provision. See D. 65-1; D. 65-2; D. 103 at 8. Defendants contend that the laws of New Hampshire will apply, as "the insurance policy was issued in New Hampshire, for a New Hampshire corporation (Nashua) insuring Nashua's garage operations, which are headquartered and largely take place in New Hampshire." D. 103 at 8. Motorists has not contested this position. See D. 107.[1] "Where both parties agree on the proper substantive law to be applied, there is generally no need to engage in further choice-of-law analysis." Scottsdale Ins. Co. v. United Rentals (N. Am.), Inc., 152 F. Supp. 3d 15, 19 (D. Mass. 2015). Even if, however, the parties did

---

[1] Motorists solely dispute whether N.H. Rev. Stat. Ann. § 491:22-a ("Section 491:22-a") applies. D. 111 at 12-13. Section 491:22-a provides that specific to a declaratory judgment petition, "to determine the coverage of a liability insurance policy, the burden of proof concerning the coverage shall be upon the insurer whether he institutes the petition or whether the claimant asserting the coverage institutes the petition." N.H. Rev. Stat. Ann. § 491:22-a. Section 491:22, however, "does not apply unless the underlying liability suit is brought in New Hampshire state court." Town of Allenstown v. Nat'l Cas. Co., 36 F.3d 229, 232 (1st Cir. 1994). As the underlying suits were all filed in Massachusetts state court, Section 491:22-a is therefore inapplicable.

not consent to New Hampshire law, the insurance policy was issued for a New Hampshire corporation, for which the primary location of the corporation's sale of used autos was New Hampshire.  D. 108 ¶¶ 24-25; D. 116-1 ¶¶ 24-25; D. 103 at 8.  Accordingly, the place of performance, the location of the subject matter and the place of incorporation are all New Hampshire.  Id.  New Hampshire, therefore, has the most significant relationship to the contract and New Hampshire law applies.

### B. The Duty to Defend

In New Hampshire, an insurer's duty to defend will be "determined by whether the cause of action against the insured alleges sufficient facts in the pleadings to bring it within the express terms of the policy, even though the suit may eventually be found to be without merit."  United States Fidelity & Guaranty Co. v. Johnson Shoes, Inc., 123 N.H. 148, 151–52 (1983).  "To determine the scope of coverage, the allegations in the underlying suit must be compared to the policy provisions."  SIG Arms Inc. v. Employers Ins. of Wausau, 122 F. Supp. 2d 255, 259 (D.N.H. 2000).  An insurance contract's interpretation is a question of law.  Id.  "If a term is not defined in the policy, the term is to be given its plain and ordinary meaning, construed 'as would a reasonable person in the position of the insured based on more than a casual reading of the policy as a whole.'"  Id. (quoting High Country Assocs. v. N.H. Ins. Co., 139 N.H. 39, 41 (1994)); see Lexington Ins. Co. v. Gen. Accident Ins. Co. of Am., 338 F.3d 42, 48 (1st Cir. 2003) (noting that courts must abide by the "straightforward meaning of policy language" when possible).  However, "[t]o the extent (if at all) that any ambiguity permeates a policy exclusion, it must be construed strictly against the insurer."  B & T Masonry Constr. Co. v. Pub. Serv. Mut. Ins. Co., 382 F.3d 36, 39 (1st Cir. 2004).

Here, the Motorists' Primary Policy provides that Motorists "will pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from 'garage operations' involving the ownership, maintenance or use of covered 'autos,'" and includes as insured "anyone else while using with your permission a covered 'auto' [any] you own, hire, or borrow . . . ." D. 65-1 at 26. Motorists does not appear to dispute that the allegations in the Underlying Suits fit within the covered risks in the Policy with respect to bodily injury or accident, but rather asserts that the policy's Auto Business Exclusion, New Hampshire Endorsement, and Suspended License Exclusion preclude coverage for Lynnway and Hartwell in this instance. See generally D. 107.

    1.    *The New Hampshire Endorsement*

The New Hampshire Endorsement, an endorsement to Motorists' Primary Policy, deletes the definition of "Who Is An Insured" and replaces it, stating that "[f]or a covered 'auto' licensed or principally garaged in, or 'garage operations' conducted in, New Hampshire, this endorsement modifies insurance provided under the following: [Garage Coverage Form]." D. 101-1 at 28; D. 65 at ¶ 40. This definition provides that individuals using a covered auto, that the insured owns, hires or borrows, with the insured's permission, are "insureds" unless they are "[s]omeone using a covered 'auto' while he or she is working in a business of selling, servicing [or] repairing . . . 'autos' unless that business is yours." D. 101-1 at 29. The parties no longer dispute that the New Hampshire Endorsement applies. See D. 120 at 9 n.4. Accordingly, the New Hampshire Endorsement amends the exception to the Auto Business Exclusion and adds the Suspended License Exclusion.

    2.    *The Auto Business Exclusion*

        a)    <u>'Selling, Servicing or Repairing Autos'</u>

8

An auto business exclusion is "based on the assumption that the lack of control over the insured vehicle increases the risk to the owner's insurer," Borden v. Progressive Direct Ins. Co., 87 Mass. App. Ct. 391, 393 (2015), a risk that is neither included in the policy nor calculated in the premium charged to the owner. Accordingly, "[c]ourts have reasoned that once the automobile business assume[s] control over the insured vehicle, that business should bear the cost of insuring for such risks under its own liability policy." Id. "In some instances, an automobile insurance policy may specifically define the term 'automobile business' for purposes of an exclusion as to use of a vehicle in such a business, or an exclusion as to use by persons in such a business . . . ." 7 Am. Jur. 2d Automobile Insurance § 262 (1997). While the operation of certain businesses, like a "parking lot or automobile storage facility" generally fall within the meaning of an automobile business, such businesses are not covered by the exclusion if they are "incidental" to some other, unrelated business, like a restaurant, hotel or store. Id.

New Hampshire courts "test the language of [an insurance] policy by the touchstone of what a reasonable person in the position of the insured would have understood th[e] exclusion to mean." Case v. Fid. & Cas. Co. of New York, 105 N.H. 422, 426 (1964) (noting that "a reasonable person in the position of the insured would understand [the policy language] to mean that coverage would be excluded when the automobile was employed for some purpose in connection with the automobile business").

Here, the Motorists' Primary Policy defines an "insured" for covered "autos" as "[a]nyone else while using with your permission a covered 'auto' you own, hire, or borrow except: . . . (c) Someone using a covered 'auto' while he or she is working in a business of selling, servicing, or repairing 'autos' unless that business is your 'garage operations.'" D. 65-1 at 26. With the New Hampshire Endorsement, the provision is modified, replacing "unless that business is your 'garage

9

operations'" with "unless that business is yours." D. 101-1 at 29. Under the modified provision, permissive users, such as Lynnway and Hartwell, are barred from qualifying as insureds if they were working in the business of "selling, servicing, or repairing" autos at the time of the accident, unless the business is part of the insured's own business. Motorists argue that Lynnway and Hartwell were using the Jeep while working in the business of selling or servicing autos, particularly where Lynnway's business is as an auto auction facility. D. 107 at 18-19. Defendants argue that Lynnway provides auction and related services to auto dealers, like Nashua—who are in the business of selling autos—and does not itself carry out any of the work excepted by the exclusion. D. 103 at 12.

Neither Lynnway nor Hartwell owned or held title to the Jeep, or any of the other cars sold by Nashua. See D. 101-2 ¶ 33; D. 101-3 at 22-23. Following the standard definition of "to sell," which is "to transfer (property) by sale," Black's Law Dictionary (11th ed. 2019), Nashua was selling its autos at the AutoFair at the time of the accident and Lynnway facilitated or otherwise assisted the sales. "An auction is a public sale of property to the highest bidder by one licensed and authorized to do so and the goal is to obtain the best financial return for the seller by free and fair competition among bidders." Foley v. Wheelock, 157 N.H. 329, 334 (2008) (internal quotation marks omitted) (quoting Marten v. Staab, 537 N.W.2d 518, 522 (1995), aff'd, 543 N.W.2d 436 (1996)). Lynnway served as an auctioneer or broker, "[a]n agent who acts as an intermediary or negotiator, esp. between prospective buyers and sellers." Black's Law Dictionary (11th ed. 2019). The vehicle dealer license issued to Nashua by the State classifies Nashua as an auto dealer, thereby granting to Nashua the legal authority to transfer legal title of its vehicles. D. 101-2 ¶ 33; D. 101-3 at 62.

A reasonable person in the position of the insured, however, would understand "selling" as is it is generally understood—the transfer of property through sales. Advertisements for Lynnway's auto auction explicitly describe its services as being a "remarketing partner" for "small dealers and franchise size dealerships." D. 101-3 at 86-87. Lynnway's business was more akin to parking or similar auto services, see, e.g., Home Insurance Company v. Hartford Accident & Indemnity Co., 80 Misc. 2d 100, 102 (N.Y. Sup. Ct. 1974) (upholding auto business exclusion where car driven by the car painter was involved in an accident when it was being returned to the owner), than those not involving auto services, cf. Liberty Mut. Ins. Co. v. Sweeney, 689 F.3d 288, 293-94 (3d Cir. 2012) (holding auto business exclusion provision inapplicable where individual's use of the covered auto was "for the purpose of running a personal errand" and was not involved "in any kind of auto business"). Moreover, the intention behind the auto business exclusion provision is to protect the insured from liability when control of the auto has left that of the insured and entered the hands of an auto business. See Westfield Ins. Co. v. Advance Auto Transp., Inc., 457 F. Supp. 3d 715, 719 (D. Minn. 2020) (noting "the automobile business exclusion is a common provision and is meant to address situations in which the automobile is turned over to a business where it is likely to be driven by one over whom the insured has no control").

For example, "[w]hen a business, restaurant or otherwise, holds itself out as offering a parking service, it is reasonable for an insured to assume that the business will be liable for its own negligence and the negligent acts of its employees," as the servicer's actions "are largely beyond the automobile owners' direct control." U.S. Underwriters Ins. Co. v. Kum Gang, Inc., 443 F. Supp. 2d 348, 365 (E.D.N.Y. 2006) (holding that restaurant's valet parking service fell within "'clear and unmistakable' language of the 'auto exclusion' which bars liability when the vehicle is being 'used' in an 'auto business'"). "The auto business exclusion reflects this assumption by

11

relieving the auto insurer for liability from such negligence." Id. The exclusion applies when a covered auto "was actually used in the business," id., which is the case here. See, e.g., Sweeney, 689 F.3d at 294 (noting that automobile business exclusions "are typically intended to 'encompass a specific risk,' namely the risks associated with the operation of the automobile businesses"). Defendants argue that Lynnway was AutoFair's "preferred auction facility" and that 90-95 percent of wholesale sales of Nashua and AutoFair vehicles were sold by AutoFair at Lynnway. D. 116 at 9. Frequent use of an auction facility, however, does not equate to control over said business, nor do Defendants present any case law indicating such.

While Lynnway and Hartwell were not the sellers of the autos, in that they did not own the autos or hold their title as underscored by Defendants, they were "in a business of" selling autos—performing remarketing services and facilitating sales. See Transamerica Ins. Grp. v. State Farm Mut. Auto. Ins. Co., 492 F. Supp. 283, 287 (D. Nev. 1980). Accordingly, Motorists has no duty to defend Lynnway or Hartwell in the Underlying Suits under its Auto Business Exclusion provision.

b) 'Unless That Business Is Yours' Exception

Defendants underscore that under the New Hampshire Endorsement, the Auto Business Exclusion provision is modified from denying coverage to individuals "working in a business of selling, servicing, [or] repairing . . . 'autos' unless that business is your 'garage operations," to if ". . . unless that business is yours." D. 101-1 at 29. Defendants argue that the endorsement thereby extended coverage "beyond AutoFair's garage operations to its business generally." D. 116 at 16. Defendants also argue that the policy's use of "in" a business rather than "for" indicates that the policy extends to individuals, like Hartwell, who may not work for AutoFair but were engaged "in" the activity of selling AutoFair's vehicle. Id. Defendants further that there is also an issue of

12

control, asserting that Nashua had the authority and means to control Hartwell's conduct.  D. 116 at 18.

A plain reading of the provision, ". . . unless that business is yours," indicates that coverage is dependent on whether an individual was engaged in an auto business other than the insured's own.  See, e.g., Nationwide Mut. Ins. Co. v. Fed. Mut. Ins. Co., 204 Va. 879, 884 (1964) (noting with respect to policy barring coverage when an auto is used within "the business or occupation of selling" autos that it is "plain and clear that the company saw fit to limit the extended coverage so as to eliminate the class of risks arising from handling and operation of the car by persons identified and connected with repair shops, public garages, sales agencies, and service stations"). Moreover, with respect to control, Lynnway is an independent auto auction business.  D. 109-3 at 134-35.  At most, AutoFair or Nashua was a frequent customer of Lynnway's services, see D. 108 ¶¶ 41, 42; D. 116-1 ¶¶ 41, 42.  Being a regular or valued customer at a given auto business does not make one in 'control' of said auto business.  Accordingly, the auto business exclusion provision bars coverage for Lynnway and Hartwell.

### 3. The Suspended License Exclusion

The "New Hampshire Changes in Policy" form adds an exclusion to Motorists' Primary Policy's Garage Coverage Form, specific to insureds whose driver's licenses are suspended or revoked.  In relevant part, it states:

This insurance does not apply to:

Any "insured" for "bodily injury" or "property damage" arising out of the operation of any vehicle by that "insured" and while that "insured's" driver's license is under suspension or revocation.

D. 101-1 at 29. Motorists argues that its policies exclude Lynnway and Hartwell because the Suspended License Exclusion excludes coverage for bodily injury ". . . arising out of the operation

of any vehicle by that 'insured' and while that 'insured's' driver's license is under suspension." D. 101-1 at 29.  Motorists further contends Hartwell's license was suspended on the day of the accident, thereby making the exclusion applicable.  D. 107 at 23; D. 111 at 24.  Specifically, Motorists point to a letter from the RMV, dated May 3, 2017, which states that Hartwell had three separate indefinite suspensions that all remained "in effect" as of the date of the letter.  D. 108 ¶¶ 98, 103-105; D. 109-11 at 13.  Defendants argue Hartwell's license was reinstated on May 6, 2014 and was not subject to any additional sanctions until its expiration.  See D. 123 at 18 (citing D. 109-11 at 10).  They point to Hartwell's driving history, D. 109-11, and assert that absent any entries after May 6, 2014, it is, at minimum, in dispute, whether Hartwell's license was suspended as of May 3, 2017.  D. 123 at 18.  Given the letter from the RMV, however, which states that several suspensions on Hartwell's license "are also in effect" as of May 3, 2017, in addition to the revocation put in place on said date, the Court disagrees that the absence of another entry on Hartwell's driving history is sufficient to dispute that Hartwell's license was suspended at the time of the incident.  D. 109-11 at 10.  Accordingly, Lynnway and Hartwell are additionally barred under the Suspended License Exclusion.

    4. *Motorists' Umbrella Policy*

Regarding Motorists' Umbrella Policy, the policy specifies that it does not provide auto coverage except to the extent such coverage is provided by Motorists' Primary Policy, stating:

> [e]xcept as coverage is available to you in the underlying policies as set forth in the Schedule of Underlying Insurance, this policy does not apply to the ownership, maintenance, operation, use, loading or unloading of any automobile while away from premises owned by, rented to, or controlled by you.

D. 65-2 at 22.  Accordingly, as the Court has concluded Lynnway and Hartwell are barred from coverage under Motorists' Primary Policy, D. 107 at 25, the same is true as to Motorists' Umbrella

Policy and the Court need not address any separate arguments regarding Motorists' Umbrella Policy.

## VI. Conclusion

For the foregoing reasons, the Court ALLOWS Motorists motion for summary judgment, D. 106, and DENIES Defendants' motion for summary judgment, D. 101; D. 79, 102.[2]

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

---

[2] Motorists moved for sanctions, including but not limited to striking the RMV records from the record, on the grounds that Defendants failed to produce the RMV records as part of their Rule 26(a) disclosures. D. 125. Given the Court's holding and the reasons stated above, the motion is denied as moot as to striking such evidence and to the extent that it seeks other sanctions, the motion is denied. Similarly, the motion for leave to file a reply brief as to this motion, D. 132, is also denied as moot.